UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| ZANE E. McCRARY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:16-cv-00095-JMS-DKL |
| | ) | |
| KNOX COUNTY, INDIANA, | ) | |
| LARRY HOLSCHER, individually and in his | ) | |
| official capacity as a Knox County | ) | |
| Commissioner, ROWE SERGEANT, in his | ) | |
| official capacity as a Knox County | ) | |
| Commissioner, and DONNIE HALTER, in his | ) | |
| official capacity as a Knox County | ) | |
| Commissioner, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Presently pending before the Court in this action brought under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and the First Amendment to the United States Constitution, is Defendants' Motion to Dismiss Plaintiff Zane E. McCrary's Complaint. [Filing No. 11.] For the reasons detailed herein, the Court grants Defendants' Motion to Dismiss. [Filing No. 11.]

### I.
#### STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary, the statement need only 'give

the defendant fair notice of what the…claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).[1]

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal, Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

---

[1] Defendants assert that Mr. McCrary's claims under the FCA and the Indiana False Claims Act are subject to review under the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). [Filing No. 12 at 5-6.] However, because the claims allege retaliation based on reporting fraud, not fraud itself, they are governed by Fed. R. Civ. P. 8. *See, e.g., Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008) ("[U]nlike a FCA violation claim, a FCA retaliation claim 'does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b)'") (quoting *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220, 238 n.23 (1st Cir. 2004))); *see also Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (retaliation claim under FCA "need pass only Civil Procedure Rule 8(a)'s relatively low notice-pleadings muster"). In any event, as discussed below, Mr. McCrary's Complaint does not meet even the lower pleading standard set forth in Fed. R. Civ. P. 8. The Court does not address the Indiana claims.

## II.
### RELEVANT BACKGROUND

Consistent with the applicable standard of review set forth above, the following relevant factual allegations from Mr. McCrary's Complaint, [Filing No. 1], are taken as true for purposes of addressing the pending motion.

Mr. McCrary began working for the Knox County Highway Department in October of 2010.  [Filing No. 1 at 1.]  During the time relevant to this litigation, he held the position of "Operator," [Filing No. 1 at 2], and his "ordinary job responsibilities involved road construction work," [Filing No. 1 at 9].  Knox County receives funds from the federal government and the State of Indiana that are "specifically designated and dedicated for use by the Knox County Highway Department…for road repair, road construction, bridge repair, bridge construction and purchase of equipment and materials by the Knox County Highway Department."  [Filing No. 1 at 4.]

On August 31, 2015, Mr. McCrary had been performing work on a county road when he was visited in person by his supervisor, Jerry Haggard.  [Filing No. 1 at 2.]  Mr. Haggard instructed Mr. McCrary to use his truck to grade a side road in Johnson Township.  [Filing No. 1 at 2.]  Mr. McCrary objected to this assignment, stating that he believed the road was not a county road, and he showed Mr. Haggard that the road in question was not depicted on the county map.  [Filing No. 1 at 2.]  Mr. McCrary told Mr. Haggard that the road was used by Defendant Knox County Commissioner Larry Holscher for his own private farming purposes.  [Filing No. 1 at 2.]  Mr. Haggard told Mr. McCrary that "Well Larry said do it," and instructed him to complete the work. [Filing No. 1 at 2.]

Mr. McCrary followed Mr. Haggard's instruction and graded the road.  [Filing No. 1 at 2.] He used equipment belonging to Knox County to complete the job, and was paid by Knox County for the hour and a half he spent on this task.  [Filing No. 1 at 2.]  At the end of the work day, Mr.

McCrary filled out a Knox County Highway Department timesheet, on which he described the grading work he had done.  [Filing No. 1 at 2.]  On that sheet, Mr. McCrary noted the road was graded for "Larry," that "Jerry said do it," and that the road was "not on map" and "not county's." [Filing No. 1 at 2.]

On September 22, 2015, Mr. McCrary was called to a meeting with Knox County Highway Department Superintendent Donny Mize and Commissioner Holscher to discuss the comments he had written on the timesheet.  [Filing No. 1 at 2-3.]  Regarding these statements, Commissioner Holscher said, "If this gets in the wrong hands, we can be in trouble."  [Filing No. 1 at 3.]  Mr. McCrary was suspended without pay for five days.  [Filing No. 1 at 3.]  The written suspension form he received stated that he was being suspended for making "false accusations against supervisor and commissioner about existing county road."  [Filing No. 1 at 3.]

Following his five-day suspension, Mr. McCrary was not allowed to return to work.  [Filing No. 1 at 3.]  On or about October 7, 2015, Mr. McCrary was asked to attend a meeting with Commissioner Holscher, Defendant Donnie Halter (a Knox County Commissioner),  Defendant Rowe Sergeant (a Knox County Commissioner), Superintendent Mize, and two Knox County Sheriff's Deputies at the Knox County Highway Department Office.   [Filing No. 1 at 3.] Commissioner Holscher, speaking for the group, asked Mr. McCrary to explain what he had written on his timesheet.  [Filing No. 1 at 3.]  After telling his side of the story, Mr. McCrary was asked to leave the room so that the group could discuss the situation, and when he was brought back in, he was informed that he could resign from his position or he would be terminated.  [Filing No. 1 at 3.]  He refused to resign.  [Filing No. 1 at 3.]  Two to three days later, Mr. McCrary received a phone call from the Highway Department secretary asking that he return his work

uniforms.  [Filing No. 1 at 3.]  When Mr. McCrary went to the Highway Department office to do so, he was given a written notice of termination. [Filing No. 1 at 3.]

Mr. McCrary initiated this action on March 15, 2016, asserting: (1) a claim under the whistleblower provision of the FCA, 31 U.S.C. § 3730(h); (2) a claim under the whistleblower provision of the Indiana False Claims Act, I.C. 5-11-5.5-8 ("Indiana FCA"); (3) a claim for retaliation in violation of the First Amendment under 42 U.S.C. § 1983; and (4) a claim for tortious interference with a contractual relationship under Indiana law.  [Filing No. 1 at 6-10.]  He seeks reinstatement and damages.  [Filing No. 1 at 10.]

### III.
### DISCUSSION

Mr. McCrary asserts that he was terminated for "investigating an act of fraud against the Knox County government and for making actual written and verbal reports…about misuse of Knox County Highway Department labor, equipment and resources by Knox County Commissioner Larry Holscher, specifically, and by the Knox County Highway Department generally." [Filing No. 1 at 4.]  Defendants ask the Court to dismiss all of Mr. McCrary's claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  [Filing No. 11.]

**A.  FCA Claim**

Defendants argue that in order to state a claim for retaliation under the FCA, Mr. McCrary must allege that he was terminated because he engaged in conduct protected by the statute, and in doing so must provide a factual basis to show that Knox County submitted a false or fraudulent claim to the federal government.  [Filing No. 12 at 6-10.]  They assert that Mr. McCrary has not made any such allegations, and that "[a] local government's 'misuse of [its] labor, equipment, and resources' is not a 'false claim' under the Federal False Claims Act, and thus, any report of such is not protected activity…." [Filing No. 12 at 9.]

In response, Mr. McCrary argues that "[r]etaliation claims under the False Claims Act are certainly not so narrow that they must be based only upon facts where a plaintiff reports an employer for the act of submitting an invoice or a claim for payment to the federal government." [Filing No. 13 at 7.]  He contends that any proof of actual or possible misuse of federal funds is sufficient to form the basis of an FCA retaliation claim.  [Filing No. 13 at 7.]  He further argues that the notes on his timesheet and his subsequent oral remarks in the meetings with county officials constitute protected conduct under the FCA because he believed in good faith, and a reasonable employee in similar circumstances would believe, that his employer was committing fraud against the government.  [Filing No. 13 at 8-9.]  Therefore, he asserts, his termination was in violation of the FCA retaliation provision.  [Filing No. 13 at 8-9.]

On reply, Defendants maintain that "reporting or investigating the suspected misuse of funds is not an activity covered by the [FCA]," and that "to state a claim under the whistleblower provision a plaintiff must allege facts to show that he was investigating or reporting a false claim for payment by the federal government."  [Filing No. 14 at 2; Filing No. 14 at 5.]

The FCA was originally enacted in 1863 in order to punish and prevent fraud by defense contractors against the federal government, which had become a serious problem during the Civil War.  *See Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (citing *United States v. Bornstein*, 423 U.S. 303, 309 (1976)); *Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, 135 S. Ct. 1970, 1973 (2015) (citing S.Rep. No. 99–345, p. 8 (1986)). The FCA "was not designed to reach every kind of fraud practiced on the Government," *United States v. McNinch*, 356 U.S. 595, 599 (U.S. 1958), but instead imposes civil and criminal liability for specifically enumerated acts of fraud.  *See* 31 U.S.C. § 3729(a)(1); *Universal Health Servs. Inc.*, 136 S. Ct. at 1996.  Though the FCA has been amended several times, "its focus remains on those

who present or directly induce the submission of false or fraudulent claims." *Id.* (citing 31 U.S.C. § 3729(a))*; see also United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968) (The FCA reaches "all fraudulent attempts to cause the Government to pay out sums of money"); *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011) ("[T]o commit conduct actionable under the FCA, one must, in some way, falsely assert entitlement to obtain or retain government money or property").

Under the FCA, the term "claim":

(**A**) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that--

(**i**) is presented to an officer, employee, or agent of the United States; or

(**ii**) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

(**I**) provides or has provided any portion of the money or property requested or demanded; or

(**II**) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(**B**) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment….

31 U.S.C. § 3729(b)(2). As interpreted by the Supreme Court, "'claim' now includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc.*, 136 S. Ct. at 1996 (citing 31 U.S.C. § 3729(b)(2)(A)).

In 1968, Congress added subsection (h), often referred to as the "whistleblower" provision, to the FCA in order to ensure that individuals who investigate and report their employers'

violations of the FCA will not face adverse employment consequences. *Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004); *Neal v. Honeywell, Inc.*, 191 F.3d 827, 829 (7th Cir. 1999). To succeed on a claim for retaliation under this provision, a plaintiff is required to prove three elements: (1) that he acted in furtherance of an FCA enforcement action, so was engaged in conduct protected by the statute; (2) that his employer had knowledge that he was engaged in such protected conduct; and (3) that his discharge was motivated, at least in part, by the protected conduct. *Fanslow*, 384 F.3d at 479.

By its terms, the whistleblower provision establishes two categories of protected conduct, as it prohibits retaliation based on "lawful acts done…in furtherance of an action under this section *or* other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (emphasis added). *See also Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012) ("Section 3730(h)(1) protects two categories of conduct").

The first type of protected conduct – acts "in furtherance of" an FCA action – encompasses conduct that puts an employer "'on notice of potential [FCA] litigation.'" *Id.* (quoting *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 945 (7th Cir. 2002) (alterations in original)). The Seventh Circuit, consistent with other circuits, uses a two-part inquiry to determine whether particular conduct was "in furtherance of" an FCA action and therefore protected under the statute. *Fanslow*, 384 F.3d at 480. In order for conduct to be considered protected, it must be shown that "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002)).

The precise scope of the second category of protected conduct – "other efforts to stop" one or more FCA violations – is less clear. However, it "plainly encompasses more than just activities

undertaken in furtherance of a False Claims Act lawsuit." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015) (citing 31 U.S.C. § 3730(h)); *see also U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014). This includes things "such as reporting suspected misconduct to internal supervisors." *Halasa*, 690 F.3d at 847-48.

Mr. McCrary asserts that the comments he wrote on his timesheet and the oral statements he made to county officials at both meetings he attended constitute protected conduct within the first category.[2] [Filing No. 13 at 7-8.] Both parties agree that the appropriate standard for determining whether conduct is protected under that category is the two-part test articulated in *Fanslow*. [Filing No. 13 at 8; Filing No. 14 at 2.] Mr. McCrary argues that he satisfied both parts of this test because he has alleged that he believed in good faith, and a reasonable employee in similar circumstances would likewise believe, that the Knox County Highway Department was misusing public funds and thereby engaging in fraud against the government. [Filing No. 13 at 7-9.]

The FCA's retaliation provision is broader than Defendants assert, as a claim under the provision does not require that a false or fraudulent claim actually be submitted to the federal government directly. *See Halasa*, 690 F.3d at 847-48. However, the Act is narrower than Mr. McCrary asserts, because a false or fraudulent claim must be made to some entity in order for the Act to apply. In *U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731, 738 (D.C. Cir. 1998), the District of Columbia Circuit first established the proposition that, under circumstances in which an entity receives a majority of its funding from the federal government, it might be true that "a

---

[2] In his response brief, Mr. McCrary quotes a prior version of the FCA that does not include the second category of protected conduct, and does not discuss or rely upon this category in arguing that he has adequately alleged an FCA retaliation claim.

claim to a grantee is effectively a claim to the United States," and therefore the FCA will apply when a false claim is made to that entity.

Consistent with this proposition, the text of the statute was amended such that the definition of "claim" now explicitly includes demands for payment or reimbursement made to grantees of federal money who use that money for federal purposes or will ask for payment or reimbursement from the federal government.  31 U.S.C. § 3729(b)(2)(A)(ii); *see also United States ex rel. Garbe v. Kmart Corp.*, 2016 WL 3031099,  *4 (7th Cir. 2016) (explaining that while the FCA does not require presentation of a claim to the federal government, "FCA liability attaches to any false claim to any entity – public or private – implementing a government program or a program using government funds").  Ultimately, in order for the FCA to apply, a false claim must be made or contemplated, whether it be to the federal government directly or to an entity that will pay the claim with federal funds.[3]

There are three key flaws with the allegations Mr. McCrary sets forth to support his FCA retaliation claim: (1) he has not adequately alleged the involvement of the federal government or a grantee thereof; (2) he has not alleged that a claim has been made or ever will be made; and (3) the type of fraud Mr. McCrary alleges is not the type addressed by the FCA.

### 1.  Inadequate Allegations Regarding Involvement of Federal Funds

Mr. McCrary acknowledges that an FCA retaliation claim must involve the misuse of federal funds.  [*See* Filing No. 13 at 7 (Mr. McCrary citing *Yesudian* for the proposition that "[a]ny proof of misuse of federal funds or even 'possible misuse of federal funds' is sufficient to support

---

[3] It is not required that the false claim actually be transmitted to the federal government or the grantee, as investigating conduct leading up to the transmission of the claim can be considered "in furtherance of" an FCA action and therefore be protected, even if the claim does not ultimately go forward.  *See, e.g., Yesudian*, 153 F.3d at 739-40.

a retaliation claim under the False Claims Act").]  Indeed, the FCA is clear that claims to grantees or recipients of federal funding only fall within the purview of the statute if federal funds are "to be spent or used on the Government's behalf or to advance a Government program or interest," and the federal government "provides or has provided any portion of the money or property requested or demanded; or…will reimburse [the recipient] for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(ii).

Mr. McCrary has alleged that Knox County receives some federal funding, [*see* Filing No. 1 at 4 (alleging that "Knox County receives Federal funds and funds from the State of Indiana that are specifically designated and dedicated for use by the Knox County Highway Department.  This includes Federal and Indiana funds for road repair, road construction, bridge repair, bridge construction and purchase of equipment and materials by the Knox County Highway Department").]  As discussed above, while it is sufficient to allege that a claim was made to a grantee that receives a majority of funding from the federal government, *Yesudian*, 153 F.3d at 739-40, Mr. McCrary has not alleged that a majority of the County's funding comes from the federal government, that the funds are used by the County to advance a federal government program or interest, or that the federal government will be responsible for paying or reimbursing any portion of the costs associated with the allegedly fraudulent grading job.  His vague allegation that Knox County receives some federal funding is not enough to bring his retaliation claim within the purview of the FCA.

### 2.  *No Allegation That a "Claim" Was Made*

Mr. McCrary's FCA retaliation claim also falls short because an FCA retaliation claim must involve the potential or actual filing of a "claim," and he has not alleged that any such claim was made or will be made.  Mr. McCrary relies upon *Yesudian*, along with two other cases, *Boone*

11

*v. MountainMade Foundation*, 64 F.Supp.3d 216 (D.D.C. 2014) and *Kuhn v. LaPorte County Comprehensive Mental Health Counsel*, 2008 WL 4099883 (N.D. Ind. 2008), in support of his assertion that "[a]ny proof of misuse of federal funds or even 'possible misuse of federal funds' is sufficient to support a retaliation claim under the False Claims Act," [Filing No. 13 at 7].  Not only are none of those cases binding on this Court, but Mr. McCrary's reliance on them is misplaced because they do not establish the proposition asserted.

In *Boone*, the defendant employer was an organization that received a majority of its funding from federal grants through the Small Business Administration.  64 F. Supp. 3d at 220. The plaintiff employees were allegedly fired or demoted because they had reported to the organization's board of directors their beliefs that another employee was using her employer-issued debit card for personal expenditures.  *Id.*  The court, relying on *Yesudian*, found that the plaintiffs had engaged in protected activity under the pre-2009 version of section 3730(h) because the "Plaintiffs' personal knowledge that the substantial majority of [the organization's] funding came from federal grants, coupled with [the plaintiff bookkeeper's] specific assertion to the [board] that she was covering the improper use of SBA funds is sufficient to demonstrate that Plaintiffs' investigation reasonably could have led to a FCA action."  *Id.* at 231.

Mr. McCrary interprets this language to mean that any misuse of government funds is sufficient to establish a retaliation claim under the FCA.  However, Mr. McCrary ignores what was a critical factor in *Boone* (as well as in *Yesudian*) – that the misconduct being investigated, while indeed involving the misuse of funds, also involved the false claims to the federal government associated with the misuse of those funds.  In fact, the *Boone* court, quoting *Yesudian*, noted that "[t]o be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims," *id.* at 226 (quoting *Yesudian*, 153 F.3d at 740).

Ultimately, the *Boone* court found that the plaintiffs' conduct was protected because the facts gave rise to a reasonable possibility that their actions could have led to the discovery of evidence of "resubmission of a claim from [the defendant employer] to the federal government," and accordingly, an FCA action. *Boone*, 64 F. Supp. 3d at 230-31. The *Boone* court's use of the word "resubmission" is instructive – the plaintiffs' conduct was protected under the whistleblower provision because they were reporting to their superiors false claims for payment that were made to the defendant company (in the form of fraudulent debit card charges) that could have resulted in false claims for payment or reimbursement (in the form of false financial records submitted as a part of the grant approval or renewal process) in turn being made to the federal government. The *Yesudian* court reached a similar conclusion for the same reasons. *See Yesudian*, 153 F.3d at 739-41.

*Kuhn* is even less helpful to Mr. McCrary. That case involved the alteration of medical billing documents that were to be submitted to the U.S. Department of Health and Human Services for Medicaid reimbursement. 2008 WL 4099883 at *1. Again, this is precisely the type of conduct – false or fraudulent claims for payment made to the United States Government – that the FCA is designed to punish and prevent. As illustrated by these cases, an allegation of such conduct, or at least a set of facts that creates a reasonable probability that an FCA action might ensue, is necessary to sustain a claim under the whistleblower provision of the FCA.

Here, Mr. McCrary alleges only that Knox County receives some federal funding. [*See* Filing No. 1 at 4.] He does not allege that Knox County would or did submit any type of claim to the federal government for reimbursement relating to grading the road at issue. For example, he does not allege that Defendants were preparing, or causing someone to prepare, false financial or other records that would be submitted to the federal government. Again, merely alleging that Knox

13

County receives some federal funding – without tying that funding to grading the county road and a subsequent claim – is insufficient to allege retaliation under the FCA.

### 3.   Inadequate Allegations Regarding the Type of Fraud Alleged

Finally, Mr. McCrary's FCA retaliation claim fails because he does not allege the type of fraud covered by the FCA.  The FCA attaches liability for specific acts of fraud; it does not seek to punish fraud in a general sense.  *See McNinch*, 356 U.S. at 599 (the FCA "was not designed to reach every kind of fraud practiced on the Government").  Accordingly, in order for conduct to be within the scope of the FCA, it must involve fraud as defined by the Act and the relevant case law – namely, a false or fraudulent claim.  It follows, then, that the basis of a retaliation claim under the Act must be investigation or reports of this same type of conduct.

It may well be true that the misconduct Mr. McCrary alleges – that is, the misuse of Knox County funds in the grading of a private road, [Filing No. 13 at 7-9] – fits some definition of "fraud," or is otherwise unlawful.  However, that does not mean that Mr. McCrary is entitled to a remedy under the FCA whistleblower provision.  As discussed above, Mr. McCrary does not allege that a false claim for payment or reimbursement was ever made to the federal government or to a grantee thereof.  In fact, he does not assert that a false claim was or would be made to any federal entity at all.  The Complaint does not suggest that any of the Defendants made "direct requests to the Government for payment," or that they made "reimbursement requests…to the recipients of federal funds under federal benefits programs."  *See Universal Health Servs., Inc.*, 136 S. Ct. at 1996.  Instead, Mr. McCrary merely alleges that Knox County receives some federal funding, that his supervisor asked him (at the direction of Commissioner Holscher) to use county resources to grade a private road, and that he was terminated because he expressed his objections to that task on his timecard and in meetings with county officials.

14

Additionally, Mr. McCrary himself alleges that he was "fired for investigating an act of fraud against the Knox County government." [Filing No. 1 at 4.]  In making this allegation, he frames the misconduct he was allegedly terminated for reporting not as fraud against the federal government – which is the focus of the FCA – but as another type of fraud against a local government.  Thus, Mr. McCrary's allegations regarding illegal conduct of the Defendants are outside the purview of the FCA, as is retaliation based on those allegations.[4]

Because Mr. McCrary does not allege any facts in his Complaint that suggest he was terminated as a result of investigating or reporting false claims to the federal government or to a program operated by a grantee of the federal government, his claim under the FCA whistleblower provision must be dismissed.[5]

### B.  42 U.S.C. § 1983 Claim

 Defendants argue that Mr. McCrary's Section 1983 claim should be dismissed because the First Amendment does not protect a public employee's speech when he speaks as an employee, rather than a private citizen.  [Filing No. 12 at 12-17.]  They assert that, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), Mr. McCrary's speech was made pursuant to his official duties as a Knox County employee, and therefore he cannot sustain a claim for retaliation in violation of the First Amendment.  [Filing No. 12 at 12-17.]

---

[4] Mr. McCrary does not argue that his conduct should be considered "other efforts to stop" an FCA violation because he does not cite the version of the statute containing that language.  While the Court will not address a theory not raised by the parties, it nonetheless notes that Mr. McCrary's conduct is not protected under the second category for the same reason it is not protected under the first –he has not alleged that there was a false or fraudulent claim to the federal government.

[5] This result is consistent with a previous case in this District addressing the same issue.  *See Boyd v. Keystone Const.*, 2015 WL 4427630, *3 (S.D. Ind. 2015) ("Boyd simply does not allege that she took any action to report or try to stop any false claims for payment from the federal government; accordingly, Boyd has failed to state a claim for retaliatory discharge under the federal False Claims Act").

In response, Mr. McCrary contends that he was speaking as a private citizen on a matter of public concern. [Filing No. 13 at 9-11.] He argues that under *Lane v. Franks*, 134 S. Ct. 2369 (2014), the most important consideration is that he was speaking out against public corruption, a significant matter of public concern, and that he is therefore entitled to First Amendment protection. [Filing No. 13 at 9-11.] Moreover, he asserts that Knox County violated his constitutional rights because it cannot show a justifiable reason for terminating him based on his comments. [Filing No. 13 at 9-11.]

On reply, Defendants maintain that whether Mr. McCrary was speaking in his capacity as a public employee or as a citizen is the "threshold determination" the Court must make in evaluating the sufficiency of a First Amendment claim. [Filing No. 14 at 7-9.] They assert that *Lane* does not alter or eliminate this threshold requirement, and because Mr. McCrary did not allege sufficient facts to show that he was speaking as a private citizen, his claim must be dismissed. [Filing No. 14 at 7-9.] Defendants further argue that an employee's personal grievance, even if it touches on a matter of public interest, is not constitutionally protected speech. [Filing No. 14 at 8.]

In both *Garcetti* and *Lane*, the Supreme Court used the following inquiry to determine whether a public employee's speech is entitled to First Amendment protection:

> The first [step] requires determining whether the employee spoke *as a citizen* on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane*, 134 S. Ct. at 2378 (quoting *Garcetti*, 547 U.S. at 418) (emphasis added). The Seventh Circuit has also instructed that "[f]or a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the

speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotations and citation omitted).  "The determination of whether speech is constitutionally protected is a question of law." *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016).

The threshold issue with respect to this inquiry is whether the speech was made by the employee in his capacity as a private citizen or as a public employee.  *Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009) ("*Garcetti* requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee") (citation omitted). In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421.  This is true regardless of the content of the speech.  *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (citing *Garcetti*, 547 U.S. at 419-23).

"Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008).  *See also Garcetti*, 547 U.S. at 424-25 ("Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes").  Courts must "take a practical view of the facts alleged in the complaint, looking to the employee's level of responsibility and the context in which the statements were made." *Abcarian v. McDonald*, 617 F.3d 931, 937 (7th

17

Cir. 2010).  Moreover, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 134 S. Ct at 2379.

Courts need only "inquire into the content of the speech to ascertain whether [it] touched on a matter of public concern" if the speaker was speaking as a private citizen. *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008) (internal quotations and citations omitted).  An individual speaks on a matter of public concern if the speech "can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 134 S.Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (internal quotations omitted). "The inquiry turns on the 'content, form, and context' of the speech." *Lane*, 134 S. Ct. at 2380 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

Once it has been determined that the speech in question was made by an employee speaking as a citizen on a matter of public concern, the balancing test established in *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), is used to determine "whether the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Lane*, 134 S. Ct. at 2380 (quoting *Garcetti*, 547 U.S. at 418).  To this end, the court must weigh "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the

public services it performs through its employees." *Lane*, 134 S. Ct. at 2377 (quoting *Pickering*, 391 U.S. at 568) (alterations in original)*; see also Swetlik*, 738 F.3d at 825.

The speech at issue in Mr. McCrary's case encompasses the written notes on his timesheet as well as oral remarks made during two meetings with county officials.  The first question the Court must address is whether the Complaint alleges facts to indicate that this speech was made by Mr. McCrary in his capacity as a private citizen or, in other words, whether his statements were made pursuant to his official duties. The Complaint states that Mr. McCrary's job title was "Operator," [Filing No. 1 at 2], and that his "ordinary job responsibilities involved road construction work," [Filing No. 1 at 9].  Mr. McCrary asserts in his brief that his speech was "far outside [his] ordinary job duties," which included driving a truck but not "mak[ing] written reports or appear[ing] on behalf of the Knox County Highway Department at meetings of the Knox County Commissioners."  [Filing No. 13 at 10.]

Mr. McCrary seems to disregard the meaning of speech "pursuant to official duties" as defined by *Garcetti* and subsequent cases.  This analysis is not dependent on the particular content of an individual's official job description, nor is a job description dispositive. *Houskins*, 549 F.3d at 490.  Accordingly, the fact that he, as an "Operator," generally drove a truck and performed "road construction work" does not complete the analysis.  The question is whether the speech itself – in this case, the comments on his timesheet and the oral remarks at the meetings – were made by Mr. McCrary as a part of his official duties while he was carrying out those duties.

With respect to the written comments on the timesheet, it is clear that Mr. McCrary's speech was made pursuant to his official duties.  In the Complaint, Mr. McCrary refers to the document he filled out as "a Knox County Highway Department time sheet" and states that the comments he wrote were part of "a description of [the] grading work that he was instructed to

perform." [Filing No. 1 at 2.]  The fact that filling out a timesheet is not part of "road construction work" does not mean that it was not part of Mr. McCrary's official job duties.  On the contrary, the facts as alleged – including that he filled out this document at the end of his work day – suggest that completing a time sheet is something that Mr. McCrary was expected to do as part of his job duties.  As a practical matter, employees in many jobs are expected to complete timesheets or otherwise record their hours worked for administrative and payroll purposes.

It is unclear from the Complaint whether Mr. McCrary was required on the timesheet to write notes describing the work he completed on any given day, or whether he decided to add that information to the timesheet even though it was not a requirement.  The use of the term "written report" to refer to his comments suggests that the notes he wrote may constitute something separate from the general information he provided on the timesheet.  However, even if that is the case, the notes were nonetheless written in the course of his official duties – specifically, filling out a timesheet – for what appears to be an official purpose – identifying the work he had completed that day in his capacity as a Knox County Highway Department employee.  Thus, Mr. McCrary was speaking in his capacity as a public employee while engaging in this speech.

The remarks made at the meetings were also made pursuant to Mr. McCrary's official duties.  During those meetings, Mr. McCrary was speaking exclusively to Knox County employees about matters of Knox County business, specifically the comments written on a timesheet regarding work he performed as a county employee, with county resources.  Mr. McCrary does not allege that he voluntarily attended these meetings in order to express his views, but instead states that he was "summoned" to those meetings – implying that he was required to attend – to discuss his work, his timecard comments, and the future of his employment.  [Filing No. 1 at 2-3.]

Accordingly, the facts as alleged in the Complaint establish that he was speaking as a public employee, not as a private citizen, at these meetings.

Although the fact that Mr. McCrary was speaking as a public employee and not as a private citizen is dispositive, the Court also notes that his speech did not involve a matter of public concern, and therefore would also be deprived of First Amendment protection on that ground.  A grievance filed to further a purely private interest does not constitute protected speech, even if the topic is potentially of interest to the public.  *See Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) ("[I]f the speech concerns a subject of public interest, but the expression addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern") (emphasis omitted) (quoting *Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)); *see also Garcetti*, 547 U.S. 420 ("Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance'") (quoting *Connick*, 461 U.S. at 154).   While exposing the misappropriation of public resources is generally a subject of public interest, the content, form, and context of Mr. McCrary's statements do not suggest that he was motivated to bring this issue to the public's attention or that anyone outside of the Knox County Highway Department was ever made aware of the alleged problem.  Specifically, Mr. McCrary made his statements completely internally within the Highway Department and he does not allege any facts in the Complaint to suggest he was motivated by concern for the public good rather than a personal desire to avoid being disciplined for grading a road that he alleges the county should not have been working on.

Accordingly, Mr. McCrary has not asserted a plausible claim for relief with respect to retaliation based on his timesheet comments or his meeting remarks because the facts set forth in

his Complaint do not allege that he was speaking as a citizen on a matter of public concern.  His First Amendment retaliation claim under Section 1983 must therefore be dismissed.

### C. Indiana FCA Claim and Tortious Interference with a Contractual Relationship Claim

Because the Court is dismissing Mr. McCrary's FCA and Section 1983 claims, Mr. McCrary's only remaining claims are those brought under Indiana state law.  Accordingly, the Court must determine whether to exercise its discretion to retain jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a).

The district court ultimately has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims.  *Carlsbad Tech., Inc. v. HIF BIO, Inc.*, 556 U.S. 635 (2009); 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim…if…the district court has dismissed all claims over which it has original jurisdiction…"). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  "In the usual case in which all federal claims are dismissed before trial, the balance of these factors will point to declining to exercise jurisdiction over any remaining pendent state-law claims.  Hence the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

This litigation is in the early stages.  Defendants have not yet even answered the allegations of Mr. McCrary's Complaint, and no discovery has taken place.  Accordingly, the Court concludes that all four factors – economy, convenience, fairness, and comity – strongly weigh in favor of it

relinquishing supplemental jurisdiction over Mr. McCrary's state law claims and dismissing those claims without prejudice.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **GRANTS** Defendants' Motion to Dismiss. [Filing No. 11.]  Mr. McCrary's FCA and § 1983 claims are **DISMISSED WITH PREJUDICE** and his state law claims, over which the Court has declined to exercise supplemental jurisdiction, are **DISMISSED WITHOUT PREJUDICE**.  Final judgment shall enter accordingly.

Date:  August 4, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**